# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMES ANTHONY PENDERGRASS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-0546 (KBJ) |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ADOPTING
## REPORT & RECOMMENDATION OF THE MAGISTRATE JUDGE

In October of 2011, Plaintiff James Anthony Pendergrass, a U.S. Army veteran, fell through a roof while on a patrol mission in Afghanistan and suffered a traumatic injury.  (*See* Compl., ECF No. 1, ¶ 17.)  Pendergrass submitted an application for benefits under the Traumatic Injury Protection Servicemember's Group Life Insurance ("TSGLI") program, alleging an inability to perform several activities of daily living ("ADLs") without assistance, including bathing and dressing, for a period of 258 days. (*See id.* ¶ 18, 20.)  The Army Board for the Correction of Military Records ("the Board") denied Pendergrass's application for TSGLI benefits, and he filed the instant action on March 27, 2017 (*see id.* ¶ 31 (alleging that the Board's determination was arbitrary and capricious)), after unsuccessfully challenging the Board's determination through the internal agency review process and exhausting his administrative remedies (*see id.* ¶ 30).  Between October 25, 2017, and May 1, 2018, the agency voluntarily re-reviewed Pendergrass's benefits claim, which was, once again, denied (*see* Joint Status Report, ECF No. 14, at 1), and this prompted Pendergrass to file an amended complaint

on September 14, 2018 (*see* Am. Compl., ECF No. 16).  The parties then filed cross-motions for summary judgment (*see* Pl.'s Mot. for Summ. J., ECF No. 23; Defs.' Cross-Mot. for Summ. J., ECF No. 24), and the Court referred this matter to a Magistrate Judge for full case management (*see* Min. Order of Oct. 24, 2019).

Before this Court at present is the Report and Recommendation ("R&R") that the assigned Magistrate Judge, G. Michael Harvey, has filed regarding Pendergrass's motion for summary judgment and Defendants' cross-motion for summary judgment. (*See* Report and Recommendation, ECF No. 35.)[1]  The Report and Recommendation reflects Magistrate Judge Harvey's opinion that the Board's decision cannot be considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (*id.* at 15 (quoting 5 U.S.C. § 706(2)(A))), and, therefore, that Pendergrass's motion for summary judgment should be denied, and Defendants' cross-motion should be granted (*see id.* at 32).

Specifically, Magistrate Judge Harvey first rejects Pendergrass's argument that the Board evaluated his claim under the wrong evidentiary standard—*i.e.*, adopting a "preponderance of the evidence" standard, as opposed to a "benefit of the doubt" rule. (*Id.* at 17.)  Magistrate Judge Harvey determines that Pendergrass had waived this argument because he did not raise it before the agency (*see id.* at 19 (citing *Nuclear Energy Inst., Inc. v. E.P.A.*, 373 F.3d 1251, 1297 (D.C. Cir. 2004)), and that, in any event, the benefit of the doubt statute "does not apply to [a] determination, such as that at issue here, made by the Army or the Department of Defense" (*id.* (quoting *Sorkness v. United States*, No. 17-cv-1128, 2019 WL 4451990, at *4 (D.D.C. Sept. 17, 2019)).

---

[1] The Report and Recommendation, which is 32 pages long, is attached hereto as Appendix A.

Magistrate Judge Harvey also finds that, regardless, the evidence that Pendergrass was incapable of independently performing ADLs was so limited that his claim would have failed even under the standard that allegedly should have been applied.  (*See id.* at 20.)

Next, the R&R concludes that the Board did not err when it evaluated Pendergrass's claim for benefits by relying on the TSGLI Procedures Guide, which directs that a person is able to "independently perform" an ADL within the meaning of the applicable statute and regulation if he can "perform the activity by using accommodating equipment (such as a cane, walker, commode, etc.) or adaptive behavior[.]"  (*Id.* (internal citation omitted).)  According to the R&R, the TSGLI Procedures Guide is not inconsistent with the relevant statutory and regulatory provisions (*see id.* at 21); indeed, "the phrase 'independently perform' in the statute and regulation is best understood, in context, to mean 'to perform without the assistance of a third party'—not 'without the assistance of a cane or similar equipment'" (*id.* at 23 (quoting *Sorkness*, 2019 WL 4451990, at *6))—and thus the TSGLI Procedures Guide's formulation is entitled to deference (*see id.* at 22–23).

Lastly, Magistrate Judge Harvey explains that the Board's analysis of Pendergrass's medical records was not arbitrary and capricious.  (*See id.* at 23.)  Specifically, Magistrate Judge Harvey rejects Pendergrass's contention that the opinion of the Board's own medical advisor, on which the Board relied, was biased and conclusory.  For one thing, according to the R&R, all that Pendergrass points to as evidence of bias is the medical advisor's "syntax" (*id.* at 24); moreover, Magistrate Judge Harvey finds that Pendergrass's contention that the medical advisor's opinion is conclusory is also unsupported, given the level of explanation that is contained in that opinion (*see id.* at 25–26).  Magistrate Judge Harvey also rejects Pendergrass's

argument that the Board could not rely on a *lack* of any evidence that Pendergrass required personal assistance, given that courts have routinely found reliance on the absence of evidence to be permissible (*see id.* at 28 (citing *Hensley v. United States*, 292 F. Supp. 3d 399, 409 (D.D.C. 2018))), and, in any event, the Board further highlighted "evidence in the record that would undermine" a finding that Pendergrass needed personal assistance (*id.* at 29), and the Board properly discounted later statements of Pendergrass's wife and military subordinate because those statements were "very much at odds" with contemporaneous medical records (*id.* at 30).

In addition to articulating these conclusions, the R&R also advises the parties that either one of them may file written objections to the Magistrate Judges findings and recommendations (*id*. at 32), and it further advises the parties that failure to file timely objections might result in waiver of further review of the matters addressed therein (*id*.).  Under this Court's local rules, any party who objects to an R&R filed by a Magistrate Judge must file a written objection with the Clerk of the Court within 14 days of the party's receipt of the R&R.  *See* LCvR 72.3(b).  The due date for objections to the Magistrate Judge's R&R in the instant case has passed, and none have been filed.

This Court has reviewed Magistrate Judge Harvey's report, and agrees with its careful and thorough analysis and conclusions.  Thus, the Court will **ADOPT** the R&R in its entirety.  Accordingly, Plaintiff's Motion for Summary Judgment will be **DENIED**; Defendant's Cross-Motion for Summary Judgment will be **GRANTED**.

A separate Order accompanies this Memorandum Opinion.

DATE:  September 9, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **JAMES ANTHONY PENDERGRASS,** |
| **Plaintiff,** |
| **v.** |
| **UNITED STATES OF AMERICA, *et al.*,** |
| **Defendants.** |

**Civil Action No.**
**1:17-cv-0546 (KBJ/GMH)**

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In this action against the United States of America and various federal agencies ("Defendants" or the "government") under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, Plaintiff James Anthony Pendergrass, a U.S. Army veteran who injured his back while on a tour of duty in Kandahar, Afghanistan, challenges the decision of the Army Board for the Correction of Military Records ("ABCMR" or the "Board") denying his application for benefits under the Traumatic Injury Protection Servicemember's Group Life Insurance ("TSGLI") program.  The parties have filed cross-motions for summary judgment along with the administrative record appendix and a supplement to the administrative record appendix.[1]  Because the ABCMR's decision is not arbitrary or capricious and is supported by substantial evidence, Plaintiff's motion should be denied and Defendants' cross-motion should be granted.[2]

---

[1]  In cases involving judicial review of administrative action, Local Civil Rule 7(n)(1) requires counsel to "provide the Court with an appendix containing copies of those portions of the administrative record that are cited or otherwise relied upon in any memorandum in support of or in opposition to any dispositive motion" in order not to burden the Court with "excess material from the administrative record that does not relate to the issues raised in the motion or opposition."

[2] The most relevant docket entries for this Report and Recommendation are (1) Plaintiff's motion for summary judgment (ECF No. 23); (2) Defendants' cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment and its supporting papers (ECF Nos. 24 through 24-4); (3) Plaintiff's reply in further support of his motion for summary judgment and opposition to Defendants' cross-motion for summary judgment (ECF No. 28, originally filed in error at ECF No. 26); (4) Defendants' reply in further support of their motion for summary judgment

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

Congress established the TSGLI program to "provide short-term financial assistance to servicemembers and veterans who have suffered from traumatic injuries." *Barker v. United States*, 404 F. Supp. 3d 251, 254 (D.D.C. 2019) (citing 38 U.S.C. § 1980A.  To receive benefits, the servicemember's injury must have "result[ed] in a qualifying loss" as defined in regulations promulgated by the Secretary of Veterans Affairs pursuant to the statute.  38 U.S.C. § 1980A(a)(1), (b)(1).  According to the regulations, a qualifying loss includes "[t]raumatic injury, other than traumatic brain injury, resulting in an inability to independently perform at least 2 Activities of Daily Living (ADL)" that manifests within two years of the injury and lasts for at least 30 consecutive days.  38 C.F.R. § 9.20(d)(4), (f)(20).  Those same regulations identify the "[q]ualifying ADLs [as] bathing, continence, dressing, eating, toileting, and transferring in and out of a bed or chair with or without equipment."  *Holmes v. United States*, No. 17-cv-1674 (JDB), 2019 WL 131955, at *1 (D.D.C. Jan 8, 2019) (citing 38 C.F.R. § 9.20(e)(vi)(A)–(F)).

Because neither the statute nor the regulations define the phrase "independently perform," the Department of Veterans Affairs (the "VA") has "issued guidance to the service branches in the *Traumatic Injury Protection Under Servicemembers' Group Life Insurance (TSGLI): A Procedural Guide*" ("TSGLI Procedures Guide").  *White v. United States*, No. 17-cv-193 (RMC), 2018 WL 5251740, at *1 (D.D.C. Oct. 22, 2018).  The TSGLI Procedures Guide states that an individual is unable to independently perform an ADL when he "REQUIRES assistance" in order to perform it.  ECF No. 24-4 at 18.  Thus, an individual with a physical (rather than cognitive) injury cannot independently perform an ADL when he "requires hands-on assistance from another person" or

---

and supporting papers (ECF Nos. 27, 27-1); (5) the administrative record appendix (ECF Nos. 32-1 through 32-8); and (6) the supplement to the administrative record appendix (ECF No. 34-1).

"requires someone to be within arm's reach because [his] ability fluctuates and physical . . . assistance may be needed." *Id.* at 19.  However, "[i]f the patient is able to perform the activity by using accommodating equipment (such as a cane, walker, commode, etc.) or adaptive behavior, the patient is considered able to independently perform the activity." *Id.* at 18.

"Although the TSGLI program is administered by the VA, the service branches, which are components of the Department of Defense, are separately responsible for determining whether their members are covered by the TSGLI and whether service personnel sustained a qualifying loss." *White*, 2018 WL 5251740, at *2.  Specifically, the TSGLI statute provides that, when a service member under the jurisdiction of the Department of Defense submits a claim for benefits, the Secretary of Defense "shall certify to the Secretary [of Veterans Affairs]" whether the claimant "was at the time of the injury giving rise to the claim insured" under the program and whether the claimant "has sustained a qualifying loss."  38 U.S.C. § 1980A(f); *see also* 38 C.F.R. § 9.20(g) ("The uniformed service will certify whether you were at the time of the traumatic injury insured under Servicemembers' Group Life Insurance and whether you have sustained a qualifying loss."). The TSGLI Procedures Guide provides three levels of administrative appeal for a denied claim. ECF No. 24-4 at 71.  An Army claimant "may appeal first to the Army TSGLI Office, then to the Army Human Resources Command [ ] TSGLI Appeals Board, and finally to the Army Board of Correction of Military Records." *White*, 2018 WL 5251740, at *2.  If, at the third level of appeal, the ABCMR upholds the denial, the member's "last resort in the appeal process is suing in federal court." ECF No. 24-4 at 71.

### B.     Factual and Procedural Background

#### 1.     Medical Records

In mid-October 2011 (the exact date of the injury is unclear from the medical records, but it appears to be somewhere between October 12, 2011, and October 19, 2011) while he was deployed in Kandahar, Afghanistan, Plaintiff was walking across a roof to inspect a water tank when the roof gave way.  ECF No. 32-1 at 24; ECF No. 32-7 at 2; ECF No. 32-8 at 52.  He was able to catch himself before he fell to a lower level.  ECF No. 32-7 at 2.  The day after the injury, he "went out on mission . . . wearing his gear."  *Id.*  He first sought treatment on October 19, 2011, complaining of increasing lower back pain and pain shooting down his left leg.  *Id.*  His treatment provider "wrote him a profile for 7 days light indoor duty limited to the [forward operating base]. No running or jumping [for] 7 days."  *Id.*  She also advised him to "rest for a day or two, then ensure that he does some light activity such as stretching to make sure that his back muscles do not tighten up."  *Id.*  A medical record from October 22, 2011, indicates that Plaintiff was "Released Without Limitations" without further explanation.  *Id.* at 3.

Plaintiff, however, continued to seek medical care for his back pain.  On October 24, 2011, he reported sharp lower back pain at an intensity of seven out of ten.  *Id.* at 4.  His back had a limited range of motion, pain on flexion and extension, and tenderness to palpation.  *Id.*  It was recommended that he "decrease physical activity, work on stretching and proper lifting techniques," and take Motrin as needed.  *Id.* at 6.  On October 25, 2011, Plaintiff stated that he was "having difficulty standing from sitting and lying."  *Id.* at 7.  His gait was slow and his movement was guarded, there was tenderness in various thoracic and lumbar vertebrae, and he had limited flexion and extension, although lateral bending and rotation were intact.  *Id.*  Radiology showed normal vertebral alignment, mild disc space narrowing at L5/S1, and some degenerative changes.

*Id.* at 8.   There was "[n]o definite evidence of fracture."  *Id.*   On October 28, 2011, a physical therapist noted "major loss of flexion and extension" in his lumbar spine.  *Id.* at 9.   Plaintiff reported that the symptoms were intermittent and light ambulation "abolished his symptoms at times," although bending, flexion, and increased activity increased them.  *Id.*   Plaintiff returned to physical therapy on October 29, 2011, complaining of worse pain than the day before, but the therapy helped to relieve it.  *Id.* at 10.   On October 31, 2011, Plaintiff reported that he did not think therapy was beneficial, as the pain relief was fleeting.  *Id.* at 12.   A physical examination that same day found diffuse tenderness in the lumbar/sacral musculature, limited flexion and extension, and pain on percussion of the L4-S1 vertebrae.  *Id.* at 13.   His treatment providers recommended sending him "out of theatre for more definitive care."  *Id.*

Plaintiff was sent to Landstuhl Army Medical Center in Germany, where a physical examination on November 10, 2011—that is, between 22 and 29 days from the date of the injury—found "moderately restricted range of motion to flexion, side bending, and extension" and "diffuse tenderness . . . over the paraspinous musculature throughout the entire thoracic and lumbar region," with otherwise normal findings.  ECF No. 32-7 at 17.   The physician assessed that Plaintiff was "unlikely" to "respond to acute intervention sufficiently to allow him to return to high-impact duties."  *Id.*   A spinal MRI from November 11, 2017, revealed no fracture, mild irregularities involving the "endplates at multiple levels," and a slight narrowing of the L5-S1 disc space with a "[t]iny left-sided disc protrusion."  ECF No. 32-2 at 3–4.

Plaintiff was then transferred to Tripler Army Medical Center in Honolulu, Hawaii.  A medical record from November 15, 2011—that is, between 27 and 34 days from the date of the injury—states that Plaintiff could not "contribute to mission of unit of rear detachment if deployed." ECF No. 32-7 at 19.   In the section titled "Functional status," the treating source wrote,

"Activities of daily living [Service Member] is able to perform all IADLs without assist and in-strumental activities of daily living."[3]  *Id.*  The assessment was similar one week later on Novem-ber 22, 2011 (including the notation regarding activities of daily living), except that the health care provider added that Plaintiff had a "[f]unctioning activity level."  *Id.* at 23.  On November 28, 2011, Plaintiff reported that he suffered from "severe lumbar sacral pain, worse on the left at the Sacral-iliac region" and sometimes had pain down the left leg, but that he walked unassisted.  *Id.* at 25.  On examination, he had pain and "burning" in the lower back and limited flexion, but his gait, coordination, and balance were normal.  *Id.*  On December 13, 2011 (between 55 and 62 days after the injury), Plaintiff reported spasms and low back pain that radiated down his left leg.  *Id.* at 26.  He stated that the pain was constant and increased "with movement and lifting heavy objects."  *Id.*  His pain was moderate to severe, but he had "no basic ADL loss."  *Id.* at 29.  One month later, on January 13, 2012, Plaintiff reported "great pain relief for 2 weeks"—presumably from a trans-foraminal epidural steroid injection[4]—although the pain was "slowly starting to come back."  ECF No. 32-3 at 10.  He received another transforaminal epidural steroid injection on that date.  *Id.* Approximately three weeks later, on February 2, 2012, Plaintiff reported that the "majority of his

---

[3] "IADLs," also known as instrumental activities of daily living, are more complex tasks than the basic ADLs, and "assess a person's ability to live independently and thrive."  Peter F. Edemekong, et al., *Activities of Daily Living (ADLs)*, ncbi.nlm.nih.gov/books/NBK470404 (last visited Apr. 2, 2020); *see also, e.g.*, *McNeill v. Astrue*, No. 5:11-cv-546, 2013 WL 865621, at *9 n.12 (E.D.N.C. Feb. 20, 2013) ("Basic activities of daily living are relatively simple self-care tasks while instrumental activities of daily living are more complex tasks associated with independent liv-ing."), *report and recommendation adopted* 2013 WL 866070 (E.D.N.C. Mar. 7, 2013).  IADLs include such tasks as doing housework, shopping and storing groceries, and procuring meals and storing supplies, as well as more nebu-lous abilities, such as companionship and mental support.  *Id.* Thus, an ability to perform IADLs would appear to assume the ability to perform the more foundational ADLs.  Indeed, in this case the ABCMR interpreted the notation that Plaintiff could perform all IADLs without help as evidence that he could also perform all ADLs without assistance (ECF No. 34-1 at 17)—an interpretation Plaintiff does not challenge.

[4] "[T]ransforaminal epidural injections have gained rapid and widespread acceptance for the treatment of lumbar and lower extremity pain," having the "potential advantage" over other types of epidural injections of "targeted delivery of a steroid to the site of the pathology, presumably onto an inflamed nerve root."  L. Manchikanti, *et al.*, *Effectiveness of therapeutic lumbar trnsforaminal epidural steroid injections in managing lumbar spinal pain*, ncbi.nlm.nih.gov/pubmed/22622912 (last visited Apr. 2, 2020).

radiating pain resolved" with injections, physical therapy, and "stretching at home," although he still had back pain.[5] *Id.*

A medical record from March 20, 2012—approximately four months from the date of the injury—reflects that Plaintiff was in the Warrior Transition Brigade, known as the WTB (ECF No. 32-6 at 23), which "provides leadership, primary care, complex case management, and comprehensive transition planning in support of wounded, ill, or injured [ ] soldiers." *Warrior Transition Brigade*, U.S. Army, wwcc.capmed.mil/WTB/SitePages/Home.aspx (last visited Apr. 2, 2020). At that time, Plaintiff reported "intolerable" pain after doing "adaptive sports"—specifically, seated volleyball—but was listed as having a "[f]unctioning activity level." ECF No. 32-6 at 23. A report from March 21, 2012, states that Plaintiff "had 80% relief of pain with Sacroiliac Joint Injections" and that he was "doing great until he performed [physical therapy]." *Id.* at 17–18. Plaintiff rated his "average level of disability" as moderate to severe.[6] *Id.* at 18.  On April 3, 2012, Plaintiff reported that his pain during the last week had ranged from an intensity of five to seven on a ten-point scale.  *Id.* at 3.  On April 12, 2012, Plaintiff' physician discussed spinal cord stimulation with him and suggested that, because of his limited mobility due to pain, "he should be on a permanent profile, and he should be considered for medical board separation if the Spinal Cord Stimulation trial does not help." ECF No. 32-5 at 14–15.  Plaintiff consented to spinal cord stimulation therapy on April 17, 2012.  *Id.* at 10.  At a physical therapy appointment that same day, Plaintiff reported that he had been doing "in clinic treatments of stretching, stabilization," and

---

[5] These last two reports appear in a record dated May 31, 2012, for the Medical Evaluation Board (ECF No. 32-3 at 7), which is a component of the "Integrated Disability Evaluation System," a process "used to determine if service members coping with wounds that may prevent them from performing their duties are able to continue serving." *Integrated Disability Evaluation System (IDES)*, Army Recovery Care Program, http://wct.army.mil/modules/soldier/s6-ides.html (last visited Apr. 2, 2020).  The underlying records do not appear in the appendix.

[6] The scale ranges from "none" to "mild," "moderate," "severe," and up to "complete."  ECF No. 32-6 at 18.

transcutaneous electrical nerve stimulation with ice,[7] which "provide[d] some temporary relief that lasts a few days," but "no lasting relief." *Id.* at 5.

The next day, Plaintiff had lumbar facet medial branch nerve radiofrequency neurotomy[8] on the left side of the L4-L5 and L5-S1 vertebrae. ECF No. 32-4 at 28. Three weeks later, on May 7, 2012, Plaintiff reported "persistent, disabling back pain." ECF No. 32-4 at 8. On exami-nation, the treatment provider found that the pain worsened with bending, twisting, standing, and walking, and that Plaintiff had a "very limited range of motion with pain." *Id.* On May 10, 2012, a physician opined that Plaintiff's fall likely traumatized his spine or, at least exacerbated degen-erative spine changes, that surgical treatment was "contraindicated," and that Plaintiff did not meet retention standards. *Id.* at 4. On May 23, 2012, Plaintiff reported pain during the prior week at an intensity of between five and seven on a ten-point scale and asserted that he would not undergo spinal cord stimulation at that time. ECF No. 32-3 at 19. Seven to eight months after the injury, on June 7, 2012, and July 2, 2012, Plaintiff reported a similar level of pain and stated that he was wearing a back brace during the day. ECF No. 32-2 at 8, 25. As noted in other records from March through July 2012, Plaintiff was able to drive and had a functioning activity level. ECF No. 32-2 at 8, 25; ECF No. 32-3 at 19; ECF No. 32-4 at 22; ECF No. 32-5 at 11, 28; ECF No. 32-6 at 3, 23; ECF No. 32-7 at 1.

---

[7] Transcutaneous electrical nerve stimulation, or "TENS," is "a method of electrical stimulation which primarily aims to provide a degree of symptomatic pain relief by exciting sensory nerves, which stimulate either the pain-gate mech-anism and/or the opioid system." Takaya Maeda et al*., Does transcutaneous electrical nerve stimulation (TENS) simultaneously combined with local heat and cold applications enhance pain relief compared with TENS alone in patients with knee osteoarthritis?*, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC5684028/ (last visited Apr. 2, 2020).

[8] "Radiofrequency neurotomy uses heat generated by radio waves to target specific nerves and temporarily turn off their ability to send pain signals." *Radiofrequency Neurotomy*, http://www.mayoclinic.org/tests-procedures/radiofre-quency-neurotomy/about/pac-20394931 (last visited Apr. 2, 2020).

Plaintiff was honorably discharged from the Army, having served from September 15, 1999, through March 28, 2013.  ECF No. 32-8 at 10.  His "[p]ercentage of disability" was rated at 60 percent.  *Id.*

         2.       Administrative Appeals Process and Proceedings in this Court

Plaintiff applied for TSGLI benefits in August 2012.  ECF No. 32-1 at 4–15.  According to the medical certification of physician Dennis Hopkins, Plaintiff suffered from low back pain and left sciatica after his injury.  *Id.* at 13.  According to Dr. Hopkins, he had been treated with injections in his muscles, joints, and discs; narcotics; TENS; physical therapy; nerve ablations; radiofrequency neurotomy; and spinal cord stimulation,[9] yet still had decreased range of motion and required the use of a back brace.  *Id.*  Dr. Hopkins asserted that from October 19, 2011, until July 2, 2012, Plaintiff required assistance to bathe and dry his lower body and to put on pants, socks, and shoes.  *Id.* at 14, 16.

Plaintiff's claim was initially denied on November 30, 2012.  The Army's TSGLI certifying official had recommended denial because, "per command surgeon review," Plaintiff's medical records showed that he was "able to perform ADLs."  *Id.* at 3.  Thus, the "loss did not meet the standards for TSGLI" benefits for "traumatic injuries other than traumatic brain injuries."  *Id.* at 18.

Plaintiff requested reconsideration on January 14, 2013.  ECF No. 32-1 at 24.  Along with the request, Plaintiff filed three personal statements outlining the assistance he allegedly received from others to perform basic tasks.  Plaintiff's own letter states that, after the incident in July 2011, he was "not able to do much" for "the next 30–40 days"; he reportedly needed assistance from his

---

[9] As noted above, the records before the Court indicate that while Plaintiff originally consented to spinal cord stimulation, he then withdrew that consent.  ECF No. 32-5 at 10; ECF 32-3 at 19.  The basis for Dr. Hopkins' conclusion that Plaintiff did, indeed, undergo spinal cord stimulation is unclear.

platoon to get dressed and to get to and from the bathroom and showers, and he had food brought to his cot.  *Id.* at 30.  When he arrived in Hawaii in November 2011, approximately 30 days after his injury, his wife had to assist him "with walking, bathing, . . . getting dressed," and "standing up."  *Id.*  One of Plaintiff's subordinates in Kandahar reported that, for the "30–40 days" after Plaintiff's injury, he assisted Plaintiff with getting dressed, standing up and moving, getting to and from the bathrooms and showers, and getting in the showers.[10]  *Id.* at 31.  Plaintiff's wife asserted that, once he arrived in Hawaii, Plaintiff "needed help standing, walking, and conducting any type of movements," so she "assisted [him] with walking to and from the bathroom, bathing him, getting him dressed, tying his shoes, and any activity that required bending or walking."  *Id.* at 32. At the end of August 2013, the reconsideration request was denied because the medical documentation submitted "did not indicate that [Plaintiff's] back injury rendered [him] incapable of performing the ADLs of bathing or dressing . . . for 30 consecutive days or greater."  *Id.* at 33.

Plaintiff appealed that decision in September 2013.  ECF No. 32-1 at 37–49.  After highlighting medical records that allegedly supported his claim, the appeal request notes that "the personal ADL assistance [Plaintiff] received is not fully documented within his medical records" and suggests that the appeals board "strongly consider the statements from the servicemember's fellow soldier, wife[,] and the servicemember to supplement his medical records."  *Id.* at 48.

The appeal was denied in November 2013.  ECF No. 32-8 at 5.  The TSGLI program physician consultant noted that Plaintiff "initially responded well to pain management interventions, but thereafter spasms returned and he experienced only intermittent relief from stretching and treatment.  The medical record contains no reference to ADL level impairment, and notes that he

---

[10] As noted above, Plaintiff was transferred from Kandahar to Landstuhl by, at the latest, November 10, 2011, which was at most 29 days from the date of his injury.

drives himself." *Id.* at 6.  The panel found that the medical documentation did "not suggest [Plaintiff] was unable to perform basic ADLs for 30 or more days due to back pain.  Documents prior to day 30 do not directly address ADL loss.  Documents dated 28 days after event suggest [Plaintiff] was able to perform ADLs and IADLs without assistance and could drive." *Id.* at 5.

Plaintiff appealed to the ABCMR approximately one year later, noting that he had "the burden of proving an error or injustice by a preponderance of the evidence."  ECF No. 32-8 at 35 (quoting 32 C.F.R. § 581.3(e)(2)).  The ABCMR denied the appeal in December 2015.  *Id.* at 24–32.  It asserted that "[a]n appeal summary pertaining to the applicant's injury stated that he was able to perform ADLs independently and drive 28 days after his injury" and ultimately found that there was "insufficient documentation to support the[ ] contention that [Plaintiff's] TSGLI claims were improperly denied.  Neither the available records nor the medical documentation counsel provided establishes a basis to support this request."  *Id.* at 32.

Consequently, this action was filed on March 27, 2017.  ECF No. 1.  In May of that year, the government requested that the Court remand the case to the agency, noting that the ABCMR's decision "did not discuss why the medical professional's certification and the caregiver statements offered by Plaintiff were not persuasive or credible."  ECF No. 7 at 7.  The government suggested that "further examination off Plaintiff's TSGLI claim by the ABCMR in order to address the issues raised by Plaintiff would assist the Court's review, narrow the issues before the Court, and may, potentially, result in a different final decision and obviate the need for this litigation."  *Id* at 7–8.  The government's request was granted over Plaintiff's objection.  Minute Order dated Oct. 25, 2017; *see also* ECF No. 8.

On remand, the Army Review Boards Agency's Senior Medical Advisor to the Director (whom the parties identify as Col. Bilynsky (ECF No. 23 at 24; ECF No. 24 at 22)) issued an

advisory medical opinion.  ECF No. 20 at 2; ECF No. 32-8 at 10–14.  Col. Bilynsky noted that, in

medical records from October 19, 2011, and May 17, 2012, there was "[n]o indication" to the

health care provider that Plaintiff was "incapable of bathing or dressing by himself," and that, in a

Commander's Performance and Functional Statement of May 23, 2012, Plaintiff's commanding

officer noted that he had "not observed any diminished or decreased performance."[11]  ECF No.

32-8 at 11–12 (emphasis omitted).  He observed that, if Plaintiff were "physically unable to bathe

and dress himself" for the period from October 2011 until May 2012, it would have been "obvious

to even non-medical observers" and he questioned the veracity of assertions regarding Plaintiff's

inability to perform ADLs included in his TSGLI application and the three personal statements

submitted with his administrative appeal.  *Id.* at 12–13.  Col. Bilynsky further noted that Plaintiff

had functioning arms, hands, legs, and feet, and so should be able to bathe and dry himself with

adaptive equipment, such as a shower chair and a long-handled bath sponge, and dress himself

with other aids.  Colonel Bilynski concluded: "There are many compensatory strategies for ADLs

with or without adaptive tools used by functionally independent people with low back pain.  It is

not 'medically clear' why this Soldier with low back pain is claiming an inability to bath[e] and

dress himself independently . . . .  It is medically inexplicable!"  *Id.* at 13–14.

      The ABCMR again denied Plaintiff's claim on May 1, 2018.  ECF No. 34-1 at 1.  Its deci-

sion notes the evidence considered, repeats the procedural history of the case and the findings from

the various levels of appeal, and outlines Col. Bilynsky's advisory opinion as well as Plaintiff's

arguments objecting to the prior findings and to that advisory opinion.  *Id.* at 5–16.  The ABCMR's

analysis focuses on the lack of evidence in the medical records of Plaintiff's inability to perform

---

[11] Only portions of Col. Bilynsky's advisory medical opinion are included in the administrative record appendix filed with the Court.  Moreover, some of the records he cites—specifically, the May 17, 2012 record and the Commander's Performance and Functional Statement—are not found in the appendix.

ADLs and the presence of statements that indicate that he could do so. *Id.* at 17–18.  For example, it points to Plaintiff's neurosurgical examination on November 10, 2011, and finds that "there was no indication to the provider that [Plaintiff] was incapable of bathing or dressing himself," and that, "[b]ased on the documented physical and neurological examination by the neurosurgeon, [Plaintiff] should have been fully capable of attending to the six TSGLI ADLs." *Id.* at 17.  The ABCMR also noted that Plaintiff told the neurosurgeon that he would prefer to return to duty with his unit in Afghanistan, which "would be highly unusual for someone supposedly incapable of dressing and bathing themselves without assistance."[12] *Id.*  The ABCMR also noted that a medical record from November 15, 2011, indicates that Plaintiff could perform all ADLs, and that medical records between November 30, 2011, and April 18, 2012, fail to suggest that he could not do so; rather, they show that Plaintiff was able to drive himself to his appointments and get to and from his car without assistance.  *Id.* at 17–18.  The Board further asserted that Plaintiff "should have had no problem using either his left or right hand/arm to assist with bathing and dressing," and that "[i]f a patient is able to perform an activity by using accommodating equipment, the patient is considered able to independently perform the activity without requiring assistance." *Id.* at 18.

Addressing the statements of Plaintiff's wife and his subordinate asserting that Plaintiff needed daily assistance to dress and bathe, the Board found them not to be credible for a number of reasons.  For example, it found the letters "very much at odds with the medical records created at or near the time periods [Plaintiff] claims he was incapable of independently performing at least two ADLs," such as records from October and November 2011 stating that he had gone out on a mission the day after his injury, that he was in no acute distress with only moderately restricted

---

[12] The medical record from November 10, 2011, included in the administrative record appendix does not explicitly reflect a statement by Plaintiff that he preferred to return to Afghanistan, although it does indicate that Plaintiff was told he could not return to high-impact duties or to combat in the near term.  ECF No. 32-7 at 17–18.  In any case, neither party challenges the accuracy of the ABCMR's statement or its reliance on that statement.

range of motion, and that he could perform all IADLs." ACF No. 34-1 at 19–20. The letters also lack "facial indicia of reliability" because they are unsigned; are dated January 2, 2012, with no indication as to why the letters were written "on that particular date regarding [Plaintiff's] need for ADL assistance"; and invite the reader to contact the writer but include no contact information. *Id.* at 20–21. The Board also found it "doubtful that [Plaintiff's] chain of command would permit a situation in which an NCO was so debilitated that he required another Soldier's help to perform such simple tasks, or that it would it would permit the junior enlisted Soldier's time and attention to be dedicated to the NCO's needs in such a manner." *Id.* at 21.

In summary, the ABCMR concluded that

[t]he TSGLI program's requirement that an applicant must rely on the help of another for 30 consecutive days suggests a level of debilitation that is significantly beyond "back pain," "back discomfort," or "decreased mobility." [Plaintiff's] medical history simply does not indicate a level of debilitation that is concomitant with the loss of 2 or more ADLs for any 30-consecutive-day period.

*Id.* at 20. The Board thus "regrettably" found that Plaintiff had "not met his burden of proving by a preponderance of the evidence that he incurred the loss of 2 or more ADLs for any period of 30 consecutive days." *Id.* at 21.

Plaintiff thereafter filed an amended complaint in this action. ECF No. 16. Cross motions for summary judgment were briefed and, later, the parties filed the administrative record appendix. ECF Nos. 23–29, 32; Minute Order dated Oct. 24, 2019. The case was then referred to the undersigned and an order was issued requiring the parties to supplement the appendix, which had been incomplete. Minute Order dated Oct. 24, 2019; ECF No. 33. On February 28, 2020, the parties filed the supplement and certified that the administrative record appendix was complete. ECF No. 34.

14

## II.    LEGAL STANDARDS

Summary judgment is ordinarily appropriate when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In a case involving review of a final agency action under the APA, however, Rule 56(c)'s standard does not apply because of the court's limited role in reviewing the administrative record.  *See N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007).  Under the APA, it is the agency's role to resolve factual issues and to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769–70 (9th Cir. 1985); *Northeast Hosp. Corp v. Sebelius*, 699 F. Supp. 2d 81, 85 (D.D.C. 2010).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Northeast Hosp.*, 699 F. Supp. 2d at 85 (citing *Richards v. INS*, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977)).

"The Court reviews ABCMR decisions under section 706(2) of the APA, which provides that 'agency action, findings, and conclusions' must be held 'unlawful and set aside' if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Holmes v. United States*, No, 17-cv-1674 (JDB), 2019 WL 131955, at *5 (quoting 5 U.S.C. § 706(2)(A)).  "Judicial review under the arbitrary or capricious standard requires the Court to determine 'whether there is "such relevant evidence as a reasonable mind might accept as adequate to support" the agency's finding.'"  *Moreno v. Spencer*, 310 F. Supp. 3d 83, 86–87 (D.D.C. 2018) (quoting *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l*

*Union v. PBGC*, 707 F.3d 319, 325 (D.C. Cir. 2013)).  Such review is narrow, requiring a court to ask not "whether the record evidence could support the [plaintiff's] view of the issue," but, rather, whether the evidence "supports the [agency's] ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).  A decision of the ABCMR satisfies this standard as long as the Board "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Holmes*, 2019 WL 131955, at *5 (some internal quotation marks omitted) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Nevertheless, a reviewing court must still "engage in a substantial inquiry" that involves "a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc, v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

The government argues that, because the decision under review here comes from the ABCMR, the Court should apply the "unusually deferential application of the arbitrary or capricious standard" that generally applies to the decisions of military review boards. *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) (quoting *Kries v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)).  As Judge Kelly recently noted, "some district courts in this Circuit have been reluctant to apply this level of deference in TSGLI cases." *United States v. Cloud*, No. 17-cv-316 (TJK), 2019 WL 1924363, at *5 (D.D.C. Apr. 30, 2019) (collecting cases).  Here, however, it is unnecessary to decide whether added deference is due, as Plaintiff's claim fails under the ordinary APA standard outlined above.

16

## III.   DISCUSSION

### A.   The Benefit of the Doubt Rule

Plaintiff first argues that the ABCMR evaluated his claim under the wrong standard.  He asserts that, it was improper for the Board to apply a preponderance-of-the-evidence standard because it was required by statute to apply the "benefit of the doubt" rule, which governsclaims before the Secretary of Veterans Affairs:

> The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary.  When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant.

38 U.S.C. § 5107(b).  Plaintiff contends that, because the TSGLI program is administered by the Secretary of Veterans Affairs, that rule must be applied to TSGLI claims, such that, in order for Plaintiff's claim to be denied, "evidence of [his] ability to perform the identified ADLs must preponderate."  ECF No. 23 at 20, 28.  Put another way, he contends that the Board erroneously required him to prove his entitlement by a preponderance—that is, at least 51 percent—of the evidence, *see, e.g.*, *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 453 n.139 (D.C. Cir. 1980) ("[T]he standard of ordinary civil litigation, a preponderance of the evidence, demands only 51% certainty." (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 28 n.58 (D.C. Cir. 1976)); *United States v. Johnson*, No. 4:15-cr-40056, 2016 WL 8674640, at *12 (D.S.D. Mar. 11, 2016) ("Courts and lawyers frequently describe preponderance of the evidence as 51%—if the party with the burden adduces only slightly more evidence than the opposing party, she has satisfied her burden."), when it should have ruled in his favor even if the evidence were in equipoise—that is, if he had adduced only 50 percent of the evidence.

17

Counsel for Plaintiff has made this argument in other TSGLI cases in this District and elsewhere. *See, e.g.*, *Sorkness v. United States*, No. 17-cv-1128 (RDM), 2019 WL 4451990, at *4 (D.D.C. Sept. 17, 2019); *Barker*, 404 F. Supp. 3d at 261–62; *Holmes*, 2019 WL 131955, at *5–6; *White*, 2018 WL 5251740, at *7; *Moreno*, 310 F. Supp. 3d at 87–88; *Sparks v. United States*, No. 3:15-cv-400, 2017 WL 10940446, at *10 (W.D. Ky. Jan. 6, 2017), *report and recommendation adopted*, 2019 WL 1219351 (W.D. Ky. Jan. 25, 2019); *Koffarnus v. United States*, 175 F. Supp. 3d 769, 776–77 (W.D. Ky. 2016).  It has not fared well.  In five of the seven cases cited here, the courts found that Plaintiff had forfeit the argument because he failed to raise it before the agency. *See Holmes*, 2019 WL 131955, at *6; *White*, 2018 WL 5251740, at *7; *Moreno*, 310 F. Supp. 3d at 88; *Sparks*, 2017 WL 10940446, at *10; *Koffarnus*, 175 F. Supp. 3d at 777.  One case rejected the argument on the merits, *see Sorkness*, 2019 WL 4451990, at *4, and one case failed to address the merits because the plaintiff's claim would have been unsuccessful even if the "benefit of the doubt" standard applied, *Barker*, 404 F. Supp. 3d at 261–62.

Here, Plaintiff's argument is unsuccessful for all three reasons.  First, Plaintiff did not argue before the ABCMR that the "benefit of the doubt" rule should be applied.  Indeed, in his first round before the Board, Plaintiff stated explicitly that "the applicant 'has the burden of proving an error or injustice by a preponderance of the evidence.'"  ECF No. 32-8 at 35 (quoting 32 C.F.R. § 581.3(e)(2)).  Further, there is no indication that he made such a contention to the Board after the voluntary remand from this Court.  The administrative record appendix (including the supplement) filed by the parties in this case does not include any submission—from Plaintiff or otherwise— mentioning the "benefit of the doubt" standard.  The decision under review, which clearly outlines the arguments Plaintiff presented to the ABCMR, fails to mention that he urged the Board to apply an evidentiary standard other than preponderance of the evidence.  ECF No. 34-1 at 5–7, 11–13,

16, 18–19.  Just so, the amended complaint filed in this case after Plaintiff's claim was denied on

remand to the ABCMR asserts that "TSGLI claims are to be awarded when the preponderance of

the evidence supports the service member's claim."  ECF No. 16, ¶ 14.

"It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not

raised before an agency are waived and will not be considered by a court on review."  *White*, 2018

WL 5251740, at *7 (quoting *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir.

2004)); *see also, e.g.*, *Holmes*, 2019 WL 131955, at *6 ("The ABCMR had no chance to consider

what [the plaintiff's] argument would require this Court to find: that Army regulations obligating

the ABCMR to employ a preponderance standard on final review are invalid as facially incon-

sistent with a governing statute—that is, with the benefit of the doubt standard that 38 U.S.C. §

5107(b) purportedly mandates.  The Court declines to resolve whether a duly promulgated regula-

tion is invalid when that argument was not adequately presented to the agency." (footnote omit-

ted)).  The Court should therefore deem this argument forfeit.

Second, even if the argument were not forfeit, it would fail.  As Judge Moss held in *Sork-

ness*:

> [The plaintiff] ignores both the plain language of the "benefit of the doubt" stat-
> ute, 38 U.S.C. § 5107(b), and the regulations promulgated by the Department of
> Veterans Affairs [ ] to implement the TSGLI program, which considered the ap-
> plicability of the benefit of the doubt standard to TSGLIA claims, Traumatic Injury
> Protection Rider to Servicemembers' Group Life Insurance, 72 Fed. Reg. 10362
> (Mar. 8, 2007) (codified at 38 C.F.R. Part 9).  The statute governs the Secretary of
> Veterans Affairs' consideration of "lay and medical evidence."  38 U.S.C. §
> 5107(b).  It does not apply to determination, such as that at issue here, made by the
> Army or the Department of Defense.  *See id.*; *see also* 38 U.S.C. § 1980A(f) (set-
> ting forth process for TSGLI benefits claims).  The Department of Veterans Affairs,
> moreover, considered—and rejected—the same argument that [the plaintiff] makes
> here when it adopted regulations implementing the TSGLI program. The agency
> reasoned that "[d]ecisions about entitlement to TSGLI, unlike decisions regarding
> entitlement to VA compensation and pension, are made by each uniformed service.
> It would therefore be inappropriate for VA to promulgate a benefit-of-the-doubt

rule in this rulemaking to be applied by DoD in making decisions about TSGLI." 72
Fed. Reg. at 10,363.

(final alteration in original).[13]

Finally, as is made clear in the discussion below, *see* Section III.C, this is not a case in
which "there is an approximate balance of positive and negative evidence" on the issue of whether
Plaintiff could bathe and dress himself. 38 U.S.C. § 5107(b). The record contains little evidence
that Plaintiff was incapable of independently performing those two ADLs, and the evidence that it
does contain was properly discounted by the Board. Therefore, the result here would not have been
different even had the ABCMR applied the "benefit of the doubt" rule to Plaintiff's claim for
TGSLI benefits. *See Barker*, 404 F. Supp. 3d at 261–62 ("The Court need not resolve whether the
benefit of the doubt standard may never apply to TSGLI claims, because [the plaintiff's] claims
fail even under that standard. As the BCNR found, even if the benefit of the doubt standard was
controlling in this case, and it is not clear if it would be, it would not apply to [the plaintiff's] case
because the evidence in this case was not in equipoise, or approximately balanced.").

### B.     The TSGLI Procedures Guide

Plaintiff also contends that the ABCMR erred when it evaluated his claim for benefits by
relying on the TSGLI Procedures Guide, which directs that a person is able to "independently
perform" an ADL if he can "perform the activity by using accommodating equipment (such as a
cane, walker, commode, etc.) or adaptive behavior." ECF No. 24-4 at 18. Plaintiff did present
this argument to the ABCMR on remand, ECF No. 34-1 at 11–13 (outlining Plaintiff's argument

---

[13] One court has applied the "benefit of the doubt" rule in a TSGLI case. In *Yearwood v. United States*, the court
found that the ABCMR had "applied the wrong standard of proof to the question of whether [the] plaintiff's clearly
traumatic injury was the direct result of a traumatic event." 124 F. Supp. 3d 1204, 1216 (N.D. Ala. 2015). The
ABCMR had "acknowledged the 'benefit of the doubt' rule," but "misapplied it by effectively equating it to a prepon-
derance of the evidence standard." *Id.* That is, unlike in *Sorkness*, the *Yearwood* Court was not presented with the
argument that the "benefit of the doubt" rule applies only to claims over which the Secretary of Veterans Affairs must
evaluate evidence and make a decision based on that evidence and did not grapple with the fact that the VA has
explicitly declined to make the "benefit of the doubt" rule applicable to TSGLI claims.

that use of the Procedural Guide is legally unsupportable and "directly contradicts the TSGLI statute"), where it was rejected, *id.* at 18 ("As indicated in previous ABCMR decisions involving TGSLI benefits, this Board is not aware of any legal or prudential impediment preventing this Board, the TSGLI Office, or the VA from referring to guidelines contained in the TSGLI Procedures Guide.").

As with the argument discussed above, this is not the first time Plaintiff's counsel has objected to the use of the TSGLI Procedures Guide in administrative appeals of TSGLI claims. *See, e.g.*, *Sorkness*, 2019 WL 4451990, at *6; *Turpin v. United States*, No. 5-18-CV-0180, 2019 WL 4060892, at *6 (W.D. Tex. Feb. 19, 2019), *report and recommendation adopted*, 2019 WL 2098119 (W.D. Tex. Mar. 14, 2019); *Holmes*, 2019 WL 131955, at *7 & n.7; *Valencia v. United States*, No. 3:15-cv-0399, 2018 WL 8489603, at *4–5 (W.D. Ky. Oct. 24, 2018), *report and recommendation adopted*, 2019 WL 2372888 (W.D. Ky. Feb. 21, 2019); *White*, 2018 WL 5251740, at *5–7; *Sparks*, 2017 WL 10940446, at *9. The objection was not successful in any of those cases. Indeed, in three of them—*Sorkness*, *Holmes* and *White*, all from this District—the courts rejected the precise arguments made here, that the TSGLI Procedures Guide "make[s] up requirements without adherence or reference to any valid source of law, statutory or regulatory." ECF No. 23 at 24, 26.

As those cases rightly held, there is no merit to the contention that the guidance in the TSGLI Procedures Guide conflicts with the operative statute or regulation. *Holmes*, 2019 WL 131955, at *7; *White*, 2018 WL 5251740, at *6. Both sources define the phrase "inability to carry out the activities of daily living" as an "inability to independently perform two or more" ADLs. 38 U.S.C. § 1980A(b)(2)(D); 38 C.F.R. § 9.20(e)(6)(vi). But neither defines the term "inde-

pendently"; rather, "[t]he [TSGLI Procedures] Guide's interpretation—that a member is considered unable to perform ADLs 'independently' only if he or she requires assistance from another person, as opposed to from a device or a new technique—supplements, rather than contradicts, that definition." *Holmes*, 2019 WL 131955, at *7 (internal citation omitted); *see also White*, 2018 WL 5251740, at *6 ("[N]either the statute nor the regulation, which mirror each other, defines 'independently.' That qualifier is only given effect in the *Procedures Guide*, which denies TSGLI benefits to service members who are sufficiently 'independent' to perform six activities of daily living by themselves—even if only with the assistance of everyday equipment or behavioral changes.").

The government asserts that the TSGLI Procedures Guide is entitled to deference as "an executive department's construction of a statutory scheme it is entrusted to administer." ECF No. 24 at 19 (quoting *United States v. Mead*, 533 U.S. 218, 227–28 (2001)). Under *Skidmore v. Swift*, 323 U.S. 134 (1944), and its progeny, interpretations contained in agency manuals are entitled to deference to the extent that they "have the 'power to persuade,'" based on factors such as "an agency's 'body of experience and informed judgment,' 'the thoroughness evident in its consideration, the validity of its reasoning,' and 'its consistency with earlier and later pronouncements.'" *White*, 2018 WL 5251740, at *5 (first quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000), then quoting *Skidmore*, 323 U.S. at 140). The courts in both *Holmes* and *White* found that the TSGLI Procedures Guide's explication was entitled to deference. Judge Collyer noted that the VA had "years of experience with veteran's needs" and that that the "interpretation of 'independently' has been applied consistently since at least 2010." *White*, 2018 WL 5251740, at *6. Judge Bates agreed, adding that the interpretation

> comports with the rest of the TSGLI regulations and award amounts. Defining independence to include assistance from assistive devices or techniques certainly

22

> means that fewer and more serious injuries will qualify.  But qualifying losses under
> TSGLI generally contemplate only grave injuries. For instance, TSGLI regulations
> entitle members to $100,000 (the amount [the plaintiff] claims) for, among other
> things, "[q]uadriplegia," "[t]otal and permanent loss of sight" in both eyes, or the
> inability to independently perform ADLs due to a coma for more than 90 days—
> and only half that amount for a "total and permanent loss of speech," "total and
> permanent loss of urinary system function," or amputation of an arm, leg, foot, or
> hand.  The VA's choice to interpret "independently" to rule out, for instance, treat-
> ing the temporary use of adaptive techniques to dress as meriting the same benefit
> as quadriplegia or loss of sight is both reasonable and persuasive.

*Holmes*, 2019 WL 131955, at *7 (second and third alterations in original) (internal citation omit-

ted) (quoting 38 C.F.R. § 920(f)(1), (3), (17), (19)); *see also Valencia*, 2018 WL 8489603, at *5

(deferring to the TSGLI Procedures Guide's interpretation); *Weller v. United States*, Civil Action

No. 14-68, 2014 WL 5320133, at *3 (M.D. La. Oct. 17, 2014) (same).  Similarly, in *Sorkness*,

Judge Moss found that "the phrase 'independently perform'" in the statute and regulation "is best

understood, in context, to mean 'to perform without the assistance of a third party'—not 'without

the assistance of a cane or similar equipment.'"  2019 WL 4451990, at *6 (citing Webster's Third

New International Dictionary at 1148 (1993) (defining "independent" to mean "not requiring or

relying on others")).

The reasoning of these cases is sound, and the Court should reject Plaintiff's argument that

the ABCMR erred by following the guidance of the TSGLI Procedures Guide.

### C.   The ABCMR's Evaluation of Plaintiff's Medical Records and Other Evidence

Plaintiff mounts two primary arguments that the ABCMR's analysis of his medical records

was arbitrary and capricious.  First, he objects to the Board's reliance on Col. Bilynsky's medical

advisory opinion, asserting that the opinion is biased and conclusory.  ECF No. 23 at 26–27.  Sec-

ond, in an argument that becomes clear in Plaintiff's reply, he contends that the Board should not

have relied on gaps in the record to deny him benefits but, rather, should have "look[ed] at the

23

other available evidence that exists, such as . . . the TSGLI application, [Dr. Hopkins'] ADL cer-
tification, Plaintiff's affirmations, and statements of the caregiver witnesses to fill in the gaps."
ECF No. 28 at 5–6.  These arguments should be rejected.

> As to Col. Bilynsky's advisory opinion, Plaintiff bases his charge of bias on its syntax:

> The biased approach taken by Reviewer Bilynsky is evidenced by the pejorative
> terms he use throughout his notes to describe the supportive medical and documen-
> tary evidence such as, "This is inexplicable!" and in the tome of condescension he
> adopts with phrases like "it is *nice* that his subordinate Soldier assisted him with
> ADLs while he was still in Afghanistan, but it was not *necessary*."

ECF No. 23 at 26 (internal citations to record omitted).  But Plaintiff has not provided a logical
argument or any precedent that would support using such evidence to find bias in a military officer
who is presumed to have "discharge[d] [his] duties correctly, lawfully, and in good faith."  *Turner
v. Spencer*, 335 F. Supp. 3d 72, 77 (D.D.C. 2018) (quoting *Roberts v Harvey*, 441 F. Supp. 2d 111,
118 (D.D.C. 2006)).

> Nor is the Col. Bilynsky's advisory opinion conclusory.  Rather, as explained above, it
reviews Plaintiff's medical records to find that they fail to include indications that Plaintiff was
unable to bathe or dress himself.[14]  ECF No. 32-8 at 11–12.  It further points to a May 2012 state-
ment that Plaintiff's commanding officer had not observed any diminished or decreased perfor-
mance on Plaintiff's part and added the commonsense observation that Plaintiff's inability to bathe
and dress himself "would be obvious to even non-medical observers" at that time.  *Id.* at 12.  That
is, "Col. Bilynsky's medical advisory opinion . . . incorporates the relevant medical records and

---

[14] Plaintiff asserts that notations as to his ability to perform ADLs would not be included in medical records because
they are not "directly pertinent" to his treatment.  ECF No. 23 at 27.  Whatever the basis for that assertion (and it is
unsupported), it is belied by the records themselves, which do include references to Plaintiff's ability to perform ADLs
and IADLs and also consistently include notations that Plaintiff had a "functioning activity level."  ECF No. 32-2 at
8, 25; ECF No. 32-3 at 19; ECF No. 32-4 at 22; ECF No. 32-5 at 11, 28; ECF No. 32-6 at 3, 23; ECF No. 32-7 at 1,
19, 23.

adds 'reviewer notes' explaining the significance of particular entries." *Sorkness*, 2019 WL 451990, at *6 (approving the ABCMR's reliance on a medical advisory opinion of Col. Bilynsky).

Nevertheless, Plaintiff particularly objects to Col. Bilynsky's statement that

> [a] well-educated, cognitively normal, healthy adult with 4 functional limbs (and low back pain) should have no problem using either left or right hand/arm to assist with bathing and dressing.  If the patient is able to perform the activity by using accommodating equipment, the patient is considered able to independently perform the activity without requiring assistance.

ECF No. 23 at 7; ECF No. 32-8 at 14.  He asserts that it is the kind of conclusory statement that was disapproved in *Koffarnus*, a TSGLI case from the Western District of Kentucky.  175 F. Supp. 3d at 779.  That case does not help him, however.  In *Koffarnus*, as part of the appeal of the initial denial of the plaintiff's TSGLI claim based on a gunshot wound to her left foot, a consulting physician reviewed the plaintiff's medical records.  *Id.* at 774.  The consultant's only analysis consisted of the following two sentences: "Otherwise healthy [patients] are not rendered ADL-incapable by single limb trauma/dysfunction/immobilization.  Submitted documents do not indicate that the injury rendered the claimant incapable of performing any ADLs for 30+ days, per TSGLI guidelines."  *Id.*; *see also* Administrative Record at 86, *Koffarnus v. United States*, No. 3:15-cv-0473 (W.D. Ky. Sept. 14, 2015), ECF No. 11-2 at 89.  Ultimately, the ABCMR denied the plaintiff's claim.  "The Board's entire discussion and conclusions" consisted of five paragraphs that failed to "provide any explanation specific to [the plaintiff]," but rather "copied [the medical consultant's] conclusions and changed a few words."  *Koffarnus*, 175 F. Supp. 3d at 775, 779.  The *Koffarnus* Court found that analysis wanting, characterizing it as "a generic statement without any legal basis," and further faulted the Board for "provid[ing] no explanation for why it adopted the [medical consultant's] conclusions over the opinion of [the plaintiff's] two physicians, and especially her treating physician," who had "provided specific details supporting his conclusion that

25

[the plaintiff] was unable to independently dress, transfer, and bathe for at least thirty days after she was shot." *Id.* at 779–80 & n.10.  That is, the court found arbitrary and capricious action by the Board because it based its decision entirely on an unsupported conclusion that was directly contradicted by other medical evidence in the record.

The same is not true here.  First, Col. Bilynsky's assertion that Plaintiff should have been able to use his hands and arms to assist with bathing and dressing is not simply a generic, unsupported conclusion.  Rather, he explains it in the subsequent sentences: "There are many compensatory strategies for ADLs without or with adaptive tools used by functionally independent people with low back pain.  It is not 'medically clear' why this Soldier with low back pain is claiming an inability to bath[e] and dress himself independently . . . ."  ECF No. 32-8 at 14.  Indeed, earlier in the advisory opinion, Col. Bilynsky had provided examples of some of the adaptive devices that Plaintiff could use to help him bathe and dress, such as a long-handled bath sponge, a long shoe horn, and a sock aid.  *Id.* at 13; *see Coker*, 2016 WL 7242727, at *6 (stating that an advisory medical opinion "appropriately pointed out that 'devices are readily available, such as a loofa on a stick, [ ] which the applicant could have used, one-armed, to bathe his underarms, neck, back, and legs independently'"); *see also Mendez v. United States*, No. 16-cv-2486, 2017 WL 3705818, at *7 (S.D. Cal. Aug. 25, 2017) (citing *Coker*, 2016 WL 7242727, at *6).  Moreover, neither Col. Bilynsky nor, more importantly, the ABCMR relied on that statement alone in concluding that Plaintiff had not proved by a preponderance of the evidence that he was unable to independently bathe and dress himself for a period of 30 or more consecutive days.  *See, e.g.*, *Holmes*, 2019 WL 131955, at *9 n.9 (rejecting the plaintiff's argument that "the Board ha[d] no basis to presume that just because he had three functional limbs he was able to independently perform ADLs" by pointing out that "the burden is on [the plaintiff], not the Board to establish a qualifying loss" and

distinguishing the situation from that in *Koffarnus*, where "the Board relied solely on that 'generic' inference despite contradictory evidence . . . and failed to include 'any analysis or reasoning' in support of its decision to discount that evidence" (quoting *Koffarnus*, 175 F. Supp. 3d at 779–80)). Finally, unlike in *Koffarnus*, the record here does not include an opinion from a treating physician that Plaintiff was unable to independently perform two or more ADLs. To be sure, the record does include Dr. Hopkins' opinion (based not on a treating relationship, but rather on a review of the medical records) that Plaintiff could not independently bathe and dress himself. ECF No. 32-1 at 13–16. However, unlike Col. Bilynsky's opinion, which incorporates an analysis of the medical records, "Dr. Hopkins's opinion is conveyed (1) in a single paragraph, which describes Plaintiff's injuries [and treatment] . . . and (2) in two entries on a form, one indicating that Plaintiff needed 'assistance . . . to bathe [and dry the lower body]' . . . and one indicating that he needed assistance 'to put on pants, socks, and shoes.'" *Sorkness*, 2019 WL 4451990, at \*5. As in *Sorkness*, then, the Board was within its rights to rely on Col. Bilynsky's assessment rather than that of Dr. Hopkins. *See id.* at \*6; *see also Hensley*, 292 F. Supp. 3d at 410 ("[A]s other courts have held in TSGLI cases, the [agency] was justified in attaching little or no weight to Dr. Hopkins' certification . . . [because] it was made years after the injury on the basis of the medical records alone, not first-hand knowledge.")

Plaintiff next asserts that, rather than denying his claim based on the dearth of medical records showing that he required personal assistance to bathe and dress himself for a period of 30 or more consecutive days—a situation that Plaintiff acknowledged during the administrative appeals process, stating that "the personal ADL assistance [Plaintiff] received is not fully docu-

mented within his medical records" (ECF No. 32-1 at 48)—the ABCMR should have looked else-

where, such as to the personal statements submitted with his appeal and the certification of Dr.

Hopkins, to find in his favor.  ECF No. 23 at 28–32; ECF No. 28 at 5–6.  This argument, too, fails.

First, courts have regularly found that the ABCMR (or its equivalent in the other armed

forces) may rely on a lack of evidence that the applicant required personal assistance to perform

one or more ADLs to deny claims for TSGLI benefits.  For example, in *Coker*, the court upheld

the denial of TSGLI benefits where there was "no mention in any of the medical records" of the

plaintiff's treating physicians that the "injury had any impact on [the] ADLs of bathing or dressing"

and any complaints from the plaintiff "regarding his ability to dress or bathe" were likewise "ab-

sent from the medical records."  2016 WL 7242727, at *6.  Similarly, in *Hensley*, the court found

that the Air Force Board for Correction of Military Records—the Air Force equivalent of the

ABCMR—did not act arbitrarily or capriciously when it relied on the fact that the medical records

did not "directly show that [the plaintiff] required assistance to bathe and dress himself" and on

the conclusion that the plaintiff "could have continued to [bathe and dress himself] using his un-

injured right arm."  292 F. Supp. 3d at 409; *see also Moreno*, 310F. Supp. 3d at 88 (rejecting the

plaintiff's invitation to "discount the lack of contemporaneous documentation [that he required

human assistance to perform ADLs] because other evidence . . . implies that he was unable to in-

dependently bathe and dress" and reasoning that "it is not for this Court to make inferences from

the record evidence (or lack thereof), or to assess the strength and veracity of competing factual

assertions or medical conclusions"); *Mendez*, 2017 WL 3705818, at *6–7 (affirming the agency's

denial of TSGLI benefits where the record was "bereft of information to support the conclusion

that [the plaintiff] *required* [ ] assistance as opposed to having merely received it" and stating that

it was "perfectly logical for the [agency] to conclude, in light of the lack of an explanation to the

contrary, that [the plaintiff] would be able to 'pull up a pair of sweatpants . . . with [his] uninjured limb'" in order to independently toilet (fourth and fifth alterations in original) (quoting the record)); *cf. Sorkness*, 2019 WL 4451990, at *5 ("[T]here is no evidence in the medical records that Plaintiff was unable to [perform two ADLs] day-after-day for thirty days in a row—let alone the sort of evidence that would require the Court to set aside the ABCMR's decision as unsupported by substantial evidence. Because the statute and regulations require that type of continuity, the ABCMR reasonably (and, indeed, correctly) concluded that neither Plaintiff's medical records, nor Dr. Hopkins's corresponding certification, were sufficient to establish that Plaintiff suffered a 'qualifying loss.'"). As explained in *Moreno*, an argument that a decision to deny benefits must be reversed because there is little "documentation . . . that directly addresses [the plaintiff's] inability to perform" two or more activities of daily living "miscomprehend[s] the focus of th[e] Court's review." 310 F. Supp. 3d at 88. That review does "not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision" and prohibits a court from "substitut[ing] its judgment for that of the agency." 310 F. Supp. 3d at 88 (first alteration in original) (internal quotation marks omitted) (first quoting *Fla. Gas*, 604 F.3d at 645, then quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

Second, Plaintiff's argument is based on a misreading of the ABCMR's decision. The Board did not rely merely on the absence of medical evidence that Plaintiff required personal assistance to bathe and dress; it also pointed to evidence in the record that would undermine any such finding. For example, it highlighted the fact that "[j]ust days after" Plaintiff's accident, a medical care provider restricted him to "light indoor duty" and reported that Plaintiff "went out on mission, wearing his gear" the day after his injury, neither of which is "evocative of [a] Soldier unable to dress or bathe himself." ECF No. 34-1 at 19. The Board also stated that, "[b]ased on

the documented physical and neurological examination by the neurosurgeon" who examined Plaintiff on November 10, 2011, at Landstuhl Army Medical Center, Plaintiff "should have been fully capable of attending to the six TGSLI ADLs." *Id.* at 17.  It further pointed out that the medical provider at Plaintiff's intake appointment at Tripler Army Medical Center on November 15, 2011, indicated that Plaintiff "could, in fact, perform all ADLs without assistance."[15]  *Id.*  That establishes the required "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs.*, 463 U.S. at 43

Third, Plaintiff's recourse to the personal statements of his wife and subordinate does not aid him.  Although "courts have found that an agency's failure to consider, or to discount, first-hand caregiver statements without explanation may render an agency's decision to deny TSGLI benefits arbitrary and capricious," where the Board considers such statements, it is free to give them little or no weight, as long as it "adequately explain[s] the basis for [that] decision. *Rich v. United States*, 369 F. Supp. 3d 263, 274–75 (D.D.C. 2019); *see also Cloud*, 2019 WL 1924363, at *8 (finding that where the Board for Correction of Naval Records addressed the statements of the certifying health care provider and caregivers, it was "entitled to give greater weight to contemporaneous medical records than after-the-fact statements submitted by the certifying nurse reviewer and [the plaintiff's] caregivers").

Here, the Board laid out in detail why it found the statements of Plaintiff's wife and subordinate not credible.  Both were "very much at odds with the medical records created at or near the time periods [Plaintiff] claims he was incapable of independently performing at least two ADLs."  ECF No. 34-1 at 19; *See, e.g.*, *Cloud*, 2019 WL 1924363, at *7 ("In weighing all the

---

[15] That record explicitly states that Plaintiff could perform all IADLs without assistance.  ECF No. 32-7 at 19.  But, as noted above, *supra* n.3, the ability to perform IADLs without assistance seems to assume the ability to perform ADLs without assistance and Plaintiff has not challenged the ABCMR's interpretation of that November 15, 2011 medical record.

evidence, the BCNR was entitled to give greater weight to contemporaneous medical records than after-the-fact statements submitted by the certifying nurse reviewer and [the plaintiff's] caregivers."). Indeed, the same flaw was evident in Plaintiff's own statement and in Dr. Hopkins' certification. ECF No. 34-1 at 17. The Board also found that both of the caregivers' statements were "lacking facial indicia of reliability," such as a signature or contact information, and that the subordinate's description of the level of assistance he provided to plaintiff in a combat zone was questionable given the realities of military life and protocols. ECF No. 34-1 at 20–21. Those are plainly adequate explanations for discounting the statements. *See, e.g.*, *White*, 2018 WL 5251740, at *9 (finding the Board's explanation for giving less weight to caregivers' statements sufficient when those statements were inconsistent, inaccurate, and conflicted with contemporaneous medical records); *see also, e.g.*, *Turpin*, 2019 WL 4060892, at *6.

Properly interpreted, Plaintiff's argument directed to the merits of the ABCMR's decision "boils down to a request . . . to reweigh competing evidence, which this Court cannot do." *Turpin*, 2019 WL 4060892, at *5. Put another way, "[w]hether the Court would have found the letters compelling, would have given them greater weight, or would have reached a different conclusion is not the standard." *White*, 2018 WL 5251740, at *10. Here, as in *White* "ABCMR addressed all the evidence before it and clearly and logically provided its reasoning for finding some pieces of evidence more persuasive than others. Given its thorough review, it cannot be said that ABCMR's reasoning was arbitrary or capricious." *Id.*

Therefore, Plaintiff has not shown that the ABCMR's decision denying him TSGLI benefits should be reversed. Defendant's summary judgment motion should be granted.

## IV.    CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment (ECF No. 23) be **DENIED** and Defendant's cross-motion for summary judgment (ECF No. 24) be **GRANTED**.

*       *       *       *       *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  April 6, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

32